## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THE FORTUNE SOCIETY, INC., on behalf of itself and its participants and
JENETTA ROLFER, on behalf of herself and all others similarly situated,

                              Plaintiffs,

v.

MACY'S, INC.,

                              Defendant.

Case No.
CLASS ACTION COMPLAINT

Jury Trial Demanded

The Fortune Society, Inc. ("Fortune"), on behalf of itself and its participants, and Jenetta Rolfer, on behalf of herself and all others similarly situated (collectively, "Plaintiffs"), bring this civil rights action seeking to remedy Defendant Macy's, Inc.'s ("Macy's") violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Administrative Code §§ 8-101 *et seq.*; and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*

## PRELIMINARY STATEMENT

1.     Macy's—one of the largest American retailers—rejects job applicants, revokes job offers, and terminates the employment of people with criminal histories, even when the applicants' and employees' convictions are old, minor, and/or unrelated to the positions at issue. Because Macy's policies and practices reinforce the racial discrimination present in the criminal justice system and result in unjustified racial disparities in employment opportunities, they are unlawful under Title VII and the NYCHRL.

2.     Plaintiff Fortune is a nonprofit community-based organization that provides alternatives to incarceration and reentry assistance to individuals impacted by the criminal justice

system.  Fortune alleges that Macy's' criminal history screening policies and practices have a disparate impact on Black and Latino job applicants and employees in violation of Title VII and the NYCHRL.

3.     Fortune also alleges that Macy's violates the NYCHRL, including its Fair Chance Act ("FCA") provisions (incorporated into the NYCHRL in 2015), by denying employment to individuals based on convictions that do not have a direct relationship to the job at issue and that do not demonstrate an unreasonable risk to property or persons.  Further, in blatant disregard for the FCA provisions of the NYCHRL, Macy's asks applicants in New York City to authorize a background check *before* making a conditional offer of employment, a *per se* violation of the City's law.

4.     Macy's cannot justify its discriminatory criminal history screening policies and practices as job related or consistent with business necessity.

5.     Through this lawsuit, Fortune seeks equal opportunity for its participants to compete for jobs, lateral positions, and promotions at Macy's without facing the discriminatory barriers of Macy's invalid and unreliable criminal history screening policies and practices.

6.     Plaintiff Rolfer, hired and subsequently fired by Macy's, alleges that Macy's systematically and willfully violates the FCRA by using criminal history information contained in consumer reports to take adverse action against applicants and employees without first providing the applicant and/or employee a copy of their consumer report, a notice of their rights, or a timely notification of Macy's' intent to take an adverse action.

7.     Ms. Rolfer seeks monetary, equitable, and declaratory relief for the violation of her FCRA rights as well as those of a putative class of similarly-situated individuals.

## JURISDICTION AND VENUE

8.      This Court has federal question jurisdiction over Plaintiffs' claims pursuant to Title VII, 42 U.S.C. §§ 2000e *et seq*., and the FCRA, 15 U.S.C. §§ 1681 *et seq*., under 28 U.S.C. §§ 1331 and 1343(a)(4), as these claims arise under the laws of the United States.  This Court also has supplemental jurisdiction over Fortune's NYCHRL claims pursuant to 28 U.S.C. § 1367.

9.      Macy's, by soliciting, conducting, and transacting business in the state of New York, engages in continuous, permanent, and substantial activity within the state.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Macy's maintains its executive offices in New York, New York, and a substantial part of the unlawful events giving rise to the claims alleged herein occurred in this District.  At all relevant times, Macy's has conducted business in this District.

11.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## EXHAUSTION OF ADMINISTRATIVE REQUIREMENTS

12.      Plaintiff Fortune has exhausted its administrative requirements under Title VII. On May 15, 2017, Fortune filed a Charge of Discrimination ("Charge") against Macy's with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that Macy's' policies and practices of rejecting applicants and terminating employees based on their criminal histories have an adverse disparate impact on Black and Latino people.

13.      The Charge notified Macy's of Fortune's intent to assert these claims on behalf of itself and its participants.

14.      On April 2, 2019, the EEOC issued Fortune a Notice of Right to Sue.

15.     Plaintiff Rolfer has also initiated the required administrative action under Title VII.  On February 14, 2019, Ms. Rolfer filed a Charge with the EEOC, alleging that Macy's' policies and practices of rejecting job applicants and terminating employees based on their criminal histories have an adverse disparate impact on Black and Latino people.  Ms. Rolfer's Charge is still pending with the EEOC.

## PARTIES

### *Plaintiff Fortune Society*

16.     Fortune is a nonprofit community-based organization founded in 1967 with headquarters in Long Island City, New York and major facilities in West Harlem, New York.

17.     Fortune's mission is to support successful reentry from incarceration and promote alternatives to incarceration for individuals currently involved with the criminal justice system.

18.     To accomplish its mission, Fortune, at its expense through funds that it raises, provides employment services to individuals involved with the criminal justice system so that they can prepare for industry-specific careers or general employment.  Fortune offers soft skills coaching, job readiness training, hard skills training in several fields, and job placement services. Fortune's job training programs focus on identifying opportunities that align with participants' skillsets and interests; preparing participants to apply and successfully interview for jobs, problem solve, manage their time, and interact with coworkers in professional settings; and enhancing job retention rates for participants.

19.     Fortune assists its participants in finding living wage employment and viable career pathways, thereby increasing long-term job retention among individuals with criminal records.

20.     Fortune provides reentry-related services to over 7,000 people annually. Approximately 93% of the participants in Fortune's reentry-related programs identify as Black or Hispanic/Latino.

21.     Fortune's advocacy and direct service work are based on a close association with its participants.  Fortune's bylaws require that at least one-third of its board members are individuals who were formerly incarcerated.  Fortune's board, leadership, and employees include individuals who have had involvement with the criminal justice system, including former Fortune participants.  Additionally, Fortune participants contribute to the organization through participation in committees, direct advocacy, and providing regular feedback, giving Fortune organizational and programmatic direction.

22.     Fortune brings this case to obtain equitable and declaratory relief for its participants.  One or more Fortune participants have standing to sue in their own right.

23.     Fortune, as an organization, has been injured by Defendant's wrongful conduct as alleged herein.  Because of Defendant's unlawful policies and practices, Fortune has expended time and resources advocating for and assisting impacted participants and seeking job opportunities for participants who were rejected or terminated from Macy's or might have applied to Macy's if not for its discriminatory hiring and employment policies and practices. Defendant's employment policies and practices frustrate Fortune's mission and impact Fortune's resources.  A favorable decision in this case would directly redress these injuries.

***Plaintiff Jenetta Rolfer***

24.     Plaintiff Jenetta Rolfer is a 36-year-old Black woman who currently resides in St. Paul, Minnesota.

25.     In or about October 2018, Macy's hired Ms. Rolfer to work as a Credit Granting Representative at a call center located in Clearwater, Florida.

26.     Macy's terminated Ms. Rolfer's employment based on information that it obtained from a third-party consumer reporting agency ("CRA"), which showed a misdemeanor conviction for public nuisance stemming from a 10-year-old traffic-related incident.  Prior to taking this action, Macy's did not provide Ms. Rolfer with a copy of her background report.

***Defendant Macy's, Inc.***

27.     Macy's is a corporation with its headquarters in Cincinnati, Ohio.  It maintains executive offices in both Cincinnati, Ohio and New York, New York.

28.     Macy's owns and operates over 850 stores throughout the United States, the District of Columbia, Guam, and Puerto Rico under the titles of Macy's, Bloomingdale's, Bloomingdale's The Outlet, Macy's Backstage, and bluemercury (collectively, "Macy's").

29.     In New York, Macy's owns and operates over 80 stores.

30.     At all relevant times, Macy's has been an employer as defined by Title VII and Section 8-102 of the Administrative Code of the City of New York, and a private employer as defined by the New York Correction Law.

31.     At all relevant times, Macy's has been a "person" using "consumer reports" of Ms. Rolfer and proposed Class Members for "employment purposes," as defined by the FCRA.

## STATEMENT OF FACTS

32.     Macy's is a major retail employer offering a sizeable number of job opportunities in retail locations, distribution centers, and call centers across the United States.  Employment at Macy's can provide individuals with diverse professional and educational backgrounds a sustainable income, training, professional development, and advancement opportunities.

33.     As part of its hiring process, Macy's routinely inquires into the criminal histories of job applicants either before or after making a conditional offer of employment.

34.     Macy's asks job applicants to disclose their criminal histories as part of the hiring process.

35.     Macy's' online job application also asks applicants to authorize a criminal background check before Macy's extends a conditional offer of employment, which is impermissible in New York City pursuant to the FCA provisions of the NYCHRL.

36.     Upon information and belief, Macy's then uses the criminal history record disclosed by the applicant either on its own or in conjunction with a criminal background check report obtained from a CRA to deny employment to job applicants, revoke conditional offers, and terminate employees with criminal histories.

37.     Upon information and belief, while Macy's contacts some applicants and employees about their criminal history records, it fails to properly consider information about mitigating circumstances and evidence of rehabilitation, such as the individual's employment history (including successful work history for Macy's itself), the time that has elapsed since the conviction, or the relation between the nature of the offense and the job at issue, in making adverse employment decisions.

38.     Upon information and belief, when Macy's uses a CRA to obtain criminal history information, it willfully fails to provide applicants or employees, like Ms. Rolfer, with their consumer report and a summary of their rights under the FCRA before taking adverse actions against them.

39.     Upon information and belief, Macy's' policies and practices lead to racially discriminatory results for many qualified, hard-working applicants and employees.

***Injury to Fortune and Its Participants***

40.     Macy's' criminal history screening policies and practices impede Fortune's ability to carry out its mission to promote employment attainment and advancement for individuals with criminal justice involvement.  Fortune has expended considerable time and expense in employment and educational programming, as well as advocacy around fair chance hiring policies, to benefit its participants, and brings this lawsuit on behalf of itself and its participants.

41.     Fortune participants have applied to various positions at Macy's, have interviewed, and some have even been hired, only later to find that, because of Macy's' discriminatory criminal history screening policies and practices, Macy's refused to consider them for employment or continued employment.

42.     Macy's' overbroad and unduly rigid criminal history screening policies and practices deter Fortune from sending participants to Macy's for jobs and deters participants from applying.

43.     By implementing criminal history screening policies and practices that deny employment to qualified applicants and employees with prior criminal histories, Macy's diminishes the impact of Fortune's programmatic efforts to enable its participants to successfully reenter the workforce and rebuild their lives after contact with the criminal justice system. Further, because of Macy's' discriminatory screening policies and practices, Fortune is required to expend additional resources assisting aggrieved participants and those who would have otherwise applied to work at Macy's.

44.     Macy's' discriminatory policies and practices thwart Fortune's mission and advocacy efforts, which are severely undermined by Macy's, as a major employer who does not

observe the legal protections specifically adopted to protect persons with criminal histories from unlawful discrimination.

45.     Macy's' discriminatory criminal history screening policies and practices have a disparate impact on Black and Latino people who, as a result of systemic racial discrimination, constitute a demonstrably overrepresented segment of the criminal justice system population.  As a result, Fortune and its participants are adversely impacted by Macy's' company-wide implementation of these policies and practices.

***Violation of Plaintiff Jenetta Rolfer's Rights***

46.     In early October 2018, Ms. Rolfer applied for a full-time position as a Customer Service Representative at a Macy's call center located in Clearwater, Florida.

47.     On October 8, 2018, Macy's' Human Resources ("HR") Department sent Ms. Rolfer an email inviting her to schedule a telephone interview for the position, which she scheduled for the next day.

48.     During the telephone interview, Ms. Rolfer described her professional experience in credit granting and customer service.  Ms. Rolfer's telephone interview went well, and Macy's invited her for a second, in-person interview on October 12, 2018.

49.     On October 12, 2018, during her in-person interview, Ms. Rolfer discussed her professional background with an HR representative from Macy's' Credit and Customer Service Department.  Ms. Rolfer explained her years of relevant work experience, including:

      a.     Working in the Credit Department of Sportsman Guide for nearly four years, granting credit for purchases of hunting gear;

      b.     Working at Somnetics International as a Sales Account Manager, selling medical equipment and managing collections; and

9

      c.      Working full time as a customer service representative at a Wells Fargo call center.

50.      At the October 12th interview and after learning about Ms. Rolfer's prior work experience, the HR representative informed Ms. Rolfer that the Credit and Customer Service Department had an opening for a Credit Granting Representative and immediately extended a conditional offer of employment to Ms. Rolfer for this position, contingent on Ms. Rolfer's completion of a drug test and background check.

51.      On or around October 12, 2018, Ms. Rolfer signed and returned to Macy's new hire paperwork, which, upon information and belief, contained an employment agreement with an arbitration provision (which she later opted out of, as described below).  Macy's did not provide her with a copy of the paperwork she returned.

52.      Macy's sent Ms. Rolfer a welcome email with instructions for her to complete pre-employment paperwork and attend orientation and training commencing October 15, 2018.

53.      On or around October 23, 2018, while Ms. Rolfer was at her orientation and training, a Macy's trainer instructed Ms. Rolfer to leave orientation and report to the HR Department, where she was then directed to contact Macy's' Central Background Check Department.

54.      That same day, Ms. Rolfer called Macy's' Central Background Check Department and spoke with a Macy's representative, who raised the issue of Ms. Rolfer's misdemeanor conviction based on a background report.

55.      Macy's did not provide Ms. Rolfer with a copy of the background report on which it was relying.

56.     Although Ms. Rolfer did not have a copy of the background report to review its contents, she explained the circumstances that led to the conviction that she believed was at issue.  Specifically, Ms. Rolfer explained that the record arose from a traffic incident where she had failed to provide proof of insurance because she was unable to afford the insurance premiums at the time.

57.     The Macy's representative instructed Ms. Rolfer not to return to Macy's until someone from Macy's' HR Department contacted her.

58.     On or about October 29, 2018, a representative from Macy's' Employee Relations Department left Ms. Rolfer a voicemail message instructing her to contact Macy's within 24 hours or Macy's would consider her failure to respond a voluntary resignation.

59.     The following morning, on or about October 30, 2018, Ms. Rolfer returned the telephone call and spoke with a Macy's representative who informed her that Macy's was terminating her employment based on the results of her background report.  Ms. Rolfer still had not received a copy of the background report.

60.     On or about November 5, 2018, Ms. Rolfer received a letter from Macy's, dated October 30, 2018, stating that Macy's was rescinding her offer of employment based on the results of her background report.

61.     Over one month later, on or about December 8, 2018, Ms. Rolfer received another letter from Macy's informing her of her right to receive a copy of her background report and attaching a copy of her report.

62.     As a result of its criminal history screening policies and practices, Macy's terminated Ms. Rolfer's employment based in whole or in part on information provided in her background report.

63.     Macy's failed to provide Ms. Rolfer with a copy of her report before taking this adverse action.

64.     On or about October 30, 2018, Ms. Rolfer exercised her right to opt out of Macy's' arbitration program by timely sending a certified letter and emails to Macy's indicating her intention to opt out.

## STATEMENT OF CLAIMS

*Title VII*

65.     Title VII prohibits employment policies and practices that have a disparate impact on protected groups.  *See* 42 U.S.C. § 2000e-2(k)(2006).

66.     The EEOC has expressly found that the disproportionate arrest and conviction of African Americans "supports a finding that criminal record exclusions have a disparate impact based on race and national origin."[1]

67.     Any selection device that has such a disparate impact must have a "manifest relationship to the employment in question."  *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971).  It must "be shown to be necessary to safe and efficient job performance to survive a Title VII challenge."  *Dothard v. Rawlinson*, 433 U.S. 321, 331 n.14 (1977).  A criminal record exclusion is valid only when it "operates to effectively link specific criminal conduct, and its dangers, with the risks inherent in the duties of a particular position."  *EEOC Enforcement Guidance*, at 14.

68.     Macy's' criminal history screening policies and practices, which deny job

---

[1]     *See* U.S. Equal Emp. Opportunity Comm'n, *EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964* 9-10 (April 25, 2012), https://www.eeoc.gov/laws/guidance/arrest_conviction.cfm [hereinafter *EEOC Enforcement Guidance*].

opportunities to qualified individuals with convictions that are unrelated to the positions at issue

or too old to support a determination that the individuals could not safely and effectively perform

their jobs, have a significant and detrimental impact on Black and Latino applicants and

employees, based on their race and/or national origin.

69.     Facing widespread discrimination in the criminal justice system, Black people are

arrested and incarcerated for crimes at higher rates than whites, relative to their share of the

national population.[2]

70.     In 2018, the U.S. Bureau of Statistics reported that Black adults are 5.9 times

more likely to be incarcerated, and Latinos are 3.1 times more likely to be incarcerated, than

their white counterparts.[3]

71.     These disparities persist when examined on the state or city level: in 2010, Black

and Latino people in New York State were 7.6 and 2.8 times more likely to be incarcerated,

respectively, than their white counterparts.[4]  Additionally, the New York City Police

---

[2]      *See* Federal Bureau of Investigation, U.S. Department of Justice, *Crime in the United States 2016*, Table 21A (Arrests by Race and Ethnicity, 2016), https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-21 (showing 26.9% of arrests are of Black or African-American individuals, while 69.6% of arrests are of white individuals); U.S. Census Bureau, *Quick Facts: United States* (2018), https://www.census.gov/quickfacts/fact/table/US/PST045218 (showing Black or African-American individuals make up approximately 13.4% and whites make up 76.6% of the United States' population; estimates as of July 1, 2018).  *See also EEOC Enforcement Guidance*, *supra* note 1, at 9-10 (national data showing that Black people arrested and convicted at higher rates than whites "supports a finding that criminal record exclusions have a disparate impact based on race and national origin").

[3]      The Sentencing Project, *Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance Regarding Racial Disparities in the United States Criminal Justice System* 1 (Mar. 2018), https://www.sentencingproject.org/publications/un-report-on-racial-disparities/ [hereinafter *Report of the Sentencing Project*].

[4]      Prison Policy Initiative, *Breaking Down Mass Incarceration in the 2010 Census: State-by-State Incarceration Rates by Race/Ethnicity*, New York Profile (May 28, 2014), https://www.prisonpolicy.org/profiles/NY.html.

Department's most recent Crime and Enforcement Activity Report demonstrates that Black and Latino people in New York City are more likely to be arrested than their white counterparts for every category of crime.[5]  For example, in 2017, 74.4% of arrestees for misdemeanor criminal mischief were Black or Latino, while only 20.5% of arrestees were white,[6] despite the fact that in 2017, New York City's population was 32.1% white, 24.3% Black or African American, and 29.1% Hispanic or Latino.[7]  A recent sociological report found that between 2004 and 2012, 20-year-old Black males were stopped by police 5.6 times more than their white counterparts of the same age, and 20-year-old Latino males were stopped 2.3 times more than their white counterparts.[8]

72.    Historically and presently, Black and Latino individuals are more likely to be arrested and incarcerated because of racial profiling and other discriminatory policies and practices in the criminal justice system.[9]  Social scientists have repeatedly identified racial bias as a determining factor for the disproportionate contact between the criminal justice system and Black and Latino people in the United States.  For this reason, Black and Latino people are more likely to have criminal convictions than members of other racial groups.

---

[5]      James P. O'Neill, Police Commissioner, *Crime and Enforcement Activity in New York City (Jan 1 – Dec 31, 2017)*, https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/year-end-2017-enforcement-report.pdf.

[6]      *Id.* at 10.

[7]      U.S. Census Bureau, *QuickFacts: New York city, New York*, https://www.census.gov/quickfacts/fact/table/newyorkcitynewyork/PST045217 (estimates as of July 1, 2017).

[8]      Kalisha Dessources Figures & Joscha Legewie, *Visualizing Police Exposure by Race, Gender, and Age in New York City*, 5 Socius: Soc. Res. for a Dynamic World 1, 1-2 (2019), https://journals.sagepub.com/doi/pdf/10.1177/2378023119828913.

[9]      *See*, *e.g.*, *Report of The Sentencing Project*, *supra* note 3, at 1.

73.     Rates of criminal activity across these racial groups do not explain racial disparities in rates of arrests and convictions.[10]  For example, studies have shown that while rates of drug use are roughly equal across all races, Black people are arrested for drug offenses far more often than individuals of other races.[11]

74.     Compounding the racial biases and resulting disparities in the criminal justice system is proven employer bias against people of color with convictions as compared to white people with convictions.  For example, audit studies conducted by researchers at Harvard and Princeton Universities found that Black people with criminal records were particularly disadvantaged in the job market when compared to their white counterparts with criminal records.[12]

75.     Upon information and belief, Macy's' criminal history screening policies and practices exacerbate systemic disparities and unfairly and disproportionately limit opportunity for qualified Black and Latino applicants and employees in violation of federal and local antidiscrimination laws.

76.     Upon information and belief, in implementing its overbroad and punitive criminal history screening policies and practices, Macy's fails to ensure that its adverse employment decisions are job related and consistent with business necessity.

---

[10]     *See id.*
[11]     *See, e.g., id.* at 3.
[12]     Devah Pager et al., *Discrimination in a Low-Wage Labor Market: A Field Experiment*, 74 Am. Soc. Rev. 777, 785-86 (2009); Devah Pager et al., *Sequencing Disadvantage: Barriers to Employment Facing Young Black and White Men with Criminal Records*, 623 Annals Am. Acad. Pol. & Soc. Sci. 195, 199 (2009); Devah Pager, *The Mark of a Criminal Record*, 108 Am. J. Soc. 937, 955-61 (2003).

77.     Upon information and belief, Macy's' criminal history screening policies and practices do not account for the nature and gravity of the offense and conduct or the time since conviction.

78.     Upon information and belief, Macy's also does not account for the nature of the job held or sought.  Simply having a conviction is not an accurate proxy for determining whether an applicant would be able to perform the duties of the job.

79.     Macy's' criminal history screening policies and practices create significant barriers to employment that exclude many qualified persons, including disproportionate numbers of Black and Latino people.

80.     Any legitimate business necessity that Macy's might claim for a criminal background check screening process cannot be justified by the unduly harsh and arbitrary system Macy's has chosen to implement.  Instead, any such business necessity can be addressed by less discriminatory alternatives, such as a validated screening policy that provides an individualized assessment of each job applicant or employee in accordance with Title VII.

***The New York City Human Rights Law***

81.     "The public policy of [New York] state [and City], as expressed in [the Correction Law], [is] to encourage the licensure and employment of persons previously convicted of one or more criminal offenses."  N.Y. Corr. Law § 753(1)(a).

82.     When the Correction Law was enacted in 1976, both the legislature and the Governor recognized the need to "reverse the long history of employment discrimination against" people with criminal records by "eliminating many of the obstacles to employment." Governor's Bill Jacket, 1976, Ch. 931 Mem. of Senator Ralph J. Marino & Assemblyman Stanley Fink in Support of S. 4222-C and A. 5393-C.

83.     As articulated in the NYCHRL, "there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences, including those based on . . . conviction or arrest record."  N.Y.C. Admin. Code § 8-101.

84.     The ability to find employment is an essential aspect of reentering society for people with criminal histories.  Recidivism declines when those individuals have viable employment prospects and other stabilizing resources in their communities.

85.     Overbroad and/or arbitrary bans on hiring because of conviction histories undermine and violate the City's clearly articulated policy.

86.     Such acts of discrimination as alleged above "menace the institutions and foundation of a free democratic state."  N.Y.C. Admin. Code § 8-101.

87.     The use of these arbitrary pre-employment bans also results in discrimination based on race and national origin because it imports the racial disparities in the criminal justice system into the employment process.

88.     For these reasons, the NYCHRL forbids companies from denying employment, or aiding and abetting the denial of employment, simply because a job applicant has a criminal record.  Instead, companies must engage in an individualized evaluation of each of the factors outlined in Article 23-A of the Correction Law.

89.     The NYCHRL incorporates Article 23-A of the Correction Law, which prohibits an employer from denying employment to any person by virtue of their criminal record unless the employer can meet its burden of demonstrating one of two exceptions:

> a.     there is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought or held by the individual; or

17

     b.    the issuance or continuation of the license or the granting or continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

N.Y. Corr. Law § 752.

90.    Article 23-A of the Correction Law further requires that before taking any adverse action based on a criminal record, the employer must consider all the following factors:

     a.    The public policy of this state, as expressed in this act, to encourage the licensure and employment of persons previously convicted of one or more criminal offenses;

     b.    The specific duties and responsibilities necessarily related to the license or employment sought or held by the person;

     c.    The bearing, if any, the criminal offense or offenses for which the person was previously convicted will have on his fitness or ability to perform one or more such duties or responsibilities;

     d.    The time which has elapsed since the occurrence of the criminal offense or offenses;

     e.    The age of the person at the time of occurrence of the criminal offense or offenses;

     f.    The seriousness of the offense or offenses;

     g.    Any information produced by the person, or produced on his behalf, in regard to his rehabilitation and good conduct; and

     h.    The legitimate interest of the public agency or private employer in protecting property, and the safety and welfare of specific individuals or the general public.

N.Y. Corr. Law § 753.

91.    The New York City Commission on Human Rights' FCA guidance illuminates the Article 23-A analysis and explains that "[e]mployers must carefully conduct the Article 23-A

analysis."[13]  This means that "[o]nce an employer extends a conditional offer and learns of an applicant's criminal record, it must solicit the information necessary to properly consider each Article 23-A factor, including the applicant's evidence of rehabilitation."[14]

92.      Despite the protections in Article 23-A, New York City passed the FCA in 2015 because the City determined that Article 23-A violations regularly "occurred when applicants were asked about their records before completing the hiring process because many employers were not weighing the factors laid out in Article 23-A."[15]  To limit unlawful discrimination against job applicants with criminal records and encourage them to apply for jobs, the FCA prohibits employers from asking job applicants to disclose information about their criminal record or to authorize a background check until after the employer extends a conditional job offer.

93.      Despite knowing of its obligations under the NYCHRL, Macy's has denied, and continues to deny, employment to job applicants and employees with very old, non-job related convictions and notwithstanding mitigating circumstances and evidence of rehabilitation.

94.      Macy's has acted knowingly in breaching its duties under the NYCHRL and the FCA and has violated Plaintiffs' and other job applicants' and employees' rights.

***The Fair Credit Reporting Act***

95.      Enacted in 1970, the FCRA's passage was driven by a recognition that consumer reports play a central role in people's lives at crucial moments, such as when they apply for a

---

[13]      *See NYC Comm'n on Hum. Rts., Legal Enforcement Guidance on the Fair Chance Act, Local Law No. 63* (2015) (revised May 24, 2019), https://www1.nyc.gov/site/cchr/law/fair-chance-act.page.

[14]      *Id.*

[15]      *Id.*

job, credit, or housing.  Despite their importance, consumer reports were unregulated prior to the

FCRA's passage and had widespread errors and inaccuracies.

96.     In enacting the FCRA, Congress sought for consumer reports to be "fair and

equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper

utilization" of consumer reports.  15 U.S.C. § 1681.

97.     Congress was particularly concerned about the use of background reports in the

employment context, and therefore defined the term "consumer reports" to explicitly include

information about an individual (including their character, general reputation, or personal

characteristics) that is used to establish eligibility for employment.  *See* 15 U.S.C.

§ 1681a(d)(1)(B).

98.     The FCRA requires that "before taking any adverse action based in whole or in

part on [a consumer report]," the employer taking the adverse action must provide "the consumer

to whom the report relates" with: (i) a copy of the report and (ii) a description in writing of the

consumer's rights. 15 U.S.C. § 1681b(b)(3)(A)(i) and (ii).

99.     The FCRA defines adverse action as, among other things, "a denial of

employment or any other decision for employment purposes that adversely affects any current or

prospective employee," or "an action taken or determination that is . . . adverse to the interests of

the consumer."  15 U.S.C. § 1681a(k)(1)(B).

100.    Upon information and belief, Macy's systematically and routinely fails to provide

job applicants and employees with their consumer reports and a summary of their rights under

the FCRA before taking adverse actions against them.

101.    Macy's policies and practices cause concrete injury to job applicants and

employees because, for example, they prevent individuals from reviewing the accuracy of the

information that Macy's uses in taking adverse actions against them.  This prevents individuals

from disputing inaccurate information in their reports, engaging with Macy's about the

information it is using to determine their suitability for the job, or learning of their statutory

rights under the FCRA.

102.    Macy's has acted willfully in violating the FCRA because it knew or should have

known its obligations under the statute.  These obligations are well-established by the plain

language of the FCRA, in the promulgations and opinion letters of the Federal Trade

Commission, and in longstanding case law.  Moreover, Macy's' letters denying employment to

job applicants and terminating employees expressly reference the FCRA, establishing Macy's'

awareness of the FCRA's requirements.

103.    Despite Macy's' awareness of its legal obligations, it has breached its duties and

deprived Ms. Rolfer and other job applicants and employees of their rights under the FCRA.

## CLASS ACTION ALLEGATIONS

104.    Ms. Rolfer asserts the Fifth Cause of Action, as set forth below, against Macy's

on behalf of herself and the "FCRA Class" defined as follows:

> **FCRA Class:** All individuals who, during the applicable five-year statute of
> limitations period, were subjected to an adverse action by Macy's at least in part
> because of information in their consumer reports without first being provided with
> a copy of their consumer report and/or a statement of their rights under the FCRA.

105.    The FCRA Class identified herein is so numerous that joinder of all class

members is impracticable.  Macy's is a large retail employer with over 800 stores across the

country.  The number of job applicants and employees harmed by Macy's' violation of the

FCRA is far greater than feasibly could be addressed through joinder.  The precise number of

class members is uniquely within Macy's' knowledge, and FCRA Class Members may be

notified of the pendency of this action by published and/or mailed notice.

106.     The FCRA violations suffered by Plaintiff Rolfer are typical of those suffered by other class members, and Defendant treated Plaintiff Rolfer consistent with other class members in accordance with its standard practices.

107.     Plaintiff Rolfer will fairly and adequately represent and protect the interests of FCRA Class Members because her interests coincide with and are not antagonistic to the interests of the FCRA Class Members she seeks to represent.  Plaintiff has retained Counsel who are competent and experienced in complex class actions, including litigation pertaining to criminal background check cases under the FCRA.

108.     Common questions of law and fact exist as to all members of the FCRA Class and predominate over any questions solely affecting individual members of the Class, including but not limited to:

   a.    Whether Macy's violated the FCRA by failing to provide members of the FCRA Class adequate notice and/or copies of their criminal background reports prior to taking adverse actions against them;

   b.   Whether Macy's FCRA violations were willful;

   c.   The proper measure of statutory damages; and

   d.   The proper measure of punitive damages.

109.     Class certification is appropriate under Federal Rules of Civil Procedure 23(b)(3) because questions of law and fact common to the FCRA Class predominate over any questions affecting only individual members of the FCRA Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Macy's' conduct stems from common and uniform policies and practices, resulting in common violations of the FCRA.  Class certification will obviate the need for unduly duplicative litigation that might

result in inconsistent judgments concerning Macy's practices.  Although the relative damages suffered by individuals are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation.  Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all FCRA Class Members' claims in a single forum.

**CAUSES OF ACTION**
**FIRST CLAIM FOR RELIEF**
**Disparate Impact Discrimination**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000e *et seq*.**
**(Brought by Plaintiff Fortune on Behalf of Itself and Its Participants)**

110.    Fortune, on behalf of itself and its participants, incorporates by reference the preceding paragraphs as alleged above.

111.    Fortune timely filed its Charge containing class-wide allegations with the EEOC and has thus exhausted its administrative requirements.

112.    Macy's' criminal history screening policies and practices, which use applicants' and employees' criminal histories to screen and exclude them from obtaining and/or continuing employment, have a disparate impact on Black and Latino applicants and employees and are neither job related nor consistent with business necessity.  Even if some criminal history screening policies and practices could be justified by business necessity, a less discriminatory alternative exists that would equally serve any legitimate purpose, such as a validated screening policy that provides an individualized assessment of each job applicant or employee.

113.    As a result, Macy's' discriminatory criminal history screening policies and practices have harmed and continue to harm Fortune and its participants and constitute unlawful discrimination based on race and national origin in violation of 42 U.S.C. §§ 2000e *et seq*.

114.    Fortune and its participants have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief.  The policies and practices identified above have been in place for several years, and Macy's continues the alleged discriminatory screening practices today.  Fortune and its participants currently suffer, and will continue to suffer, irreparable injury from Macy's' discriminatory employment actions.

115.    Fortune and its participants have been harmed by Macy's' actions.  Fortune has been forced to infuse resources into additional programs and services to assist its participants who are adversely affected by Macy's' discriminatory hiring practices and policies.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Disparate Impact Discrimination**
**The New York City Human Rights Law, N.Y.C. Admin. Code § 8-101**
**(Brought by Plaintiff Fortune on Behalf of Itself and Its Participants)**

116.    Fortune, on behalf of itself and its participants, incorporates by reference the preceding paragraphs as alleged above.

117.    Macy's' criminal history screening policies and practices, which use applicants' and employees' criminal histories to screen and exclude them from obtaining and/or continuing employment, have a disparate impact on Black and Latino applicants and employees and are neither job related nor consistent with business necessity.  Even if Macy's' criminal history screening policies and practices could be justified by business necessity, a less discriminatory alternative exists that would equally serve any legitimate purpose, such as a validated screening policy that provides an individualized assessment of each job applicant or employee.

118.    As a result, Macy's' discriminatory criminal history screening policies and practices have harmed and continue to harm Fortune and its participants and constitute unlawful discrimination based on race and national origin.

24

119.    Fortune and its participants have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief.  The policies and practices identified above have been in place for several years, and Macy's continues the alleged discriminatory screening practices today.  Fortune and its participants currently suffer, and will continue to suffer, irreparable injury from Macy's' discriminatory employment actions.

120.    Fortune and its participants have been harmed by Macy's' actions.  Fortune has been forced to infuse resources into additional programs and services to assist its participants who are adversely affected by Macy's' discriminatory hiring practices and policies.

**THIRD CLAIM FOR RELIEF**
**Discriminatory Denial and Termination of Employment**
**The New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(10)**
**(Brought by Plaintiff Fortune on Behalf of Itself and Its Participants)**

121.    Fortune, on behalf of itself and its participants, incorporates the preceding paragraphs as alleged above.

122.    Macy's denied employment to Fortune's participants based on their criminal history information.

123.    Before denying employment to Fortune's participants, Macy's failed to weigh the factors outlined in Article 23-A of the Correction Law, in violation of N.Y.C. Admin Code § 8-107(10) and N.Y. Correction Law § 753.

124.    As a result of Macy's' actions, Fortune and its participants have been harmed. Fortune's participants have been deprived of their rights and have lost employment opportunities, earnings, and other employment benefits.

125.    Fortune has been forced to infuse resources into additional programs and services to assist its participants who are adversely affected by Macy's' violation of the NYCHRL.

**FOURTH CLAIM OF RELIEF**
**Unlawful Inquiry into Criminal History Prior to Conditional Offer**
**The New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(11-a)(3)**
**(Brought by Plaintiff Fortune on Behalf of Itself and Its Participants)**

126.    Fortune, on behalf of itself and its participants, incorporates the preceding

paragraphs as alleged above.

127.    Prior to extending a conditional offer of employment to applicants in New York

City, Macy's asks applicants to authorize a criminal background check.

128.    Macy's' inquiry into applicants' criminal history prior to extending a conditional

offer of employment violates the NYCHRL, N.Y.C. Admin. Code § 8-107(11-a)(3), and

constitutes a *per se* violation of the FCA.

129.    As a result, Fortune participants have been deprived of their rights.

130.    Fortune has been forced to expend resources to direct participants to alternative

sources of employment after being adversely impacted by Macy's' violation of the FCA and

NYCHRL.

**FIFTH CLAIM OF RELIEF**
**Failure to Provide Consumer Reports and FCRA Notices Before Taking Adverse Action**
**The Fair Credit Reporting Act, 15 U.S.C. § 1681b(b)(3)(A)**
**(Brought by Plaintiff Rolfer on Behalf of Herself**
**and the FCRA Class)**

131.    Ms. Rolfer, on behalf of herself and the FCRA Class, incorporates the preceding

paragraphs as alleged above.

132.    Macy's took adverse employment actions against Ms. Rolfer and the FCRA Class

based in whole or in part on the information contained within their consumer reports.

133.    Macy's violated the FCRA, 15 U.S.C. § 1681b(b)(3)(A)(i), by failing to provide

Ms. Rolfer and the FCRA Class with a copy of their consumer reports and a reasonable amount

of time to respond before taking these adverse employment actions.

26

134.     Macy's further violated the FCRA, 15 U.S.C. § 1681b(b)(3)(A)(ii), by failing to

provide Ms. Rolfer and the FCRA Class a written description of their rights under the FCRA

before taking these adverse employment actions.

135.     These failures are each separate violations of the FCRA.

136.     Macy's' policies and practices caused concrete injury (including the risk of harm)

to Ms. Rolfer and the FCRA Class, by preventing them from:

  a.     evaluating information contained in the consumer reports to ensure
         accuracy;

  b.     challenging and correcting that information;

  c.     explaining the circumstances surrounding that information (even if
         accurate);

  d.     explaining why information reported should not preclude
         employment;

  e.     explaining why information on the consumer report that was
         different from information on the application should not preclude
         employment; and

  f.     learning of their rights and opportunities under the FCRA, including
         the opportunity to file suit under the FCRA.

137.     Macy's acted willfully in violating the FCRA, *i.e.* it acted in knowing or reckless

disregard of its obligations and the rights of Ms. Rolfer and the FCRA Class.

138.     Macy's' willful conduct is reflected by, among other things, the fact that it

violated a clear statutory mandate set forth in 15 U.S.C. § 1681b(b)(3)(A).

139.     Macy's' willful conduct is further reflected by the following:

  a.     The FCRA has been enforceable for almost fifty years since its
         enactment and Macy's has had years to become compliant;

  b.     Macy's repeatedly and routinely took adverse action against
         individuals based in whole or in part on information contained in
         consumer reports before providing them with a copy of the

consumer report or informing them of their FCRA rights;

    c.    Because of this policy and practice, Macy's voluntarily risked violating the law, which was substantially greater than the risk associated with a reading of the law that was merely careless.

140.    As a result of Macy's actions, Ms. Rolfer and the FCRA Class have been deprived of their consumer rights and the opportunity to timely and effectively contest the adverse actions taken against them and have had their privacy invaded.

141.    Plaintiff Rolfer and the FCRA Class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, pursuant to 15 U.S.C. § 1681n(a)(1)(A).

142.    Plaintiff Rolfer and the FCRA Class are entitled to such amount of punitive damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2).

143.    Plaintiff Rolfer and the FCRA Class are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and Class Members pray for relief as follows:

    a.    A declaratory judgment that the practices complained of herein are unlawful and violate Title VII, the NYCHRL, and the FCRA;

    b.    A preliminary and permanent injunction against Defendant and all officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs, and usages set forth herein, consistent with less discriminatory alternatives;

    c.    An order that Defendant institute and carry out policies, practices, and programs that provide equal employment opportunities for applicants with criminal records who would be eligible under application of the Uniform Guidelines for Employee Selection Procedures and related EEOC Guidance, and that Defendant eradicate the effects of past and present unlawful employment practices;

d.      Certification of the case as a class action on behalf of the FCRA Class;

e.      Designation of Plaintiff Rolfer as representative of Class Members;

f.      Designation of Plaintiffs' counsel of record as Class Counsel;

g.      Authorization to issue proper notice to the FCRA Class at Defendant's expense;

h.      A declaration that Defendant acted willfully, in deliberate or reckless disregard of Plaintiff Rolfer's and the FCRA Class's rights and Defendant's obligations under the FCRA;

i.      An award of statutory and punitive damages as provided by the FCRA;

j.      An award of damages caused to Fortune by the illegal policies and practices alleged herein;

k.      An award of costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

l.      Payment of reasonable service awards to Plaintiffs, in recognition of the services they have rendered and will continue to render to Class Members, and the risks they have taken and will take;

m.      Pre-judgment and post-judgment interest, as provided by law; and

n.      Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury in this action.

June 26, 2019
New York, New York                          Respectfully submitted,

                                            By:  _/s/ Ossai Miazad_____
                                            **OUTTEN & GOLDEN LLP**
                                            Ossai Miazad
                                            Lewis Steel
                                            Cheryl-Lyn Bentley
                                            685 Third Avenue, 25th Floor
                                            New York, New York 10017
                                            Telephone: (212) 245-1000
                                            Facsimile: (646) 509-2060

**NAACP LEGAL DEFENSE
AND EDUCATIONAL FUND, INC.**
Rachel Kleinman
40 Rector Street, 5th Floor
New York, New York 10006

Coty Montag*
Sparky Abraham*
700 14th Street NW, Suite 600
Washington, DC 20005
Tel.: (202) 216-5573

**Youth Represent**
Michael Pope
Eric Eingold
Dale Ventura
11 Park Place, Suite 1512
New York, NY 10007
Tel.: (646) 759-8080

*Pro hac vice* motions forthcoming

*Attorneys for Plaintiffs and the Putative Classes*